**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 3:15 CR 00009-1 |
| v. | ) | Judge Marvin E. Aspen |
| | ) | |
| TROY MITCHELL MCCORMICK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

MARVIN E. ASPEN, District Judge:

This matter is before us for the sentencing of Defendant Troy Mitchell McCormick, who pled guilty to two counts of wire fraud, 18 U.S.C. § 1343 (Counts Two and Three), and one count of mail fraud, 18 U.S.C. § 1341 (Count Nine), on March 29, 2016. (*See generally* Plea Agreement, Dkt. No. 37.) Following completion of a presentence investigation report ("PSR") and submission of sentencing positions and sentencing memoranda, we held a sentencing hearing on September 20, 2016. As detailed below, that hearing was continued to January 10, 2017. We requested that the United States Probation Office conduct additional presentence investigation and invited additional briefing from the parties in order to investigate and address a number of apparent misstatements and misrepresentations McCormick made during the September 20, 2016 hearing.

After considering all of the evidence, the testimony presented at both the September 20, 2016 and the January 10, 2017 sentencing hearings, the PSR and two supplements thereto, the initial and subsequent related filings by the parties, and the arguments presented by counsel, we address whether adjustments to the advisory guideline range are warranted here under the United States Sentencing Guidelines ("U.S.S.G.") for obstruction of justice

under § 3C1.1 and acceptance of responsibility under § 3E1.1.  For the reasons that follow, we adopt the second supplemental PSR and determine application of § 3C1.1 is proper here, but we decline to apply credit for acceptance of responsibility under § 3E1.1 as advocated by McCormick's attorney.  After considering all of the factors set forth in 28 U.S.C § 3553(a), we determine a downward variance from the sentencing guideline range of 57 to 71 months to 46 months imprisonment, as advocated by the parties, is reasonable and appropriate under the circumstances.  Accordingly, we sentence McCormick to 46 months imprisonment.

## BACKGROUND

The undisputed factual basis for McCormick's guilty plea is set forth in detail in the plea agreement and will not be fully repeated here.  We discuss solely the facts relevant to the sentencing issues before us as detailed below.

### A.  Crime of Conviction

McCormick was charged in a 14-count indictment with mail fraud, wire fraud, and aggravated identity theft in violation of 18 U.S.C. §§ 1341, 1343, and 1028A, respectively. (*See* Indictment, Dkt. No. 1.)  McCormick engaged in fraudulent conduct in connection with his employment at Emdeon, a company headquartered in Nashville, Tennessee that provided data and information services to hospitals, health systems and other customers in the healthcare industry.  (*Id.* ¶ 1.)  Emdeon hired McCormick as a sales representative and a vice president for business development, responsible for overseeing the accounts of certain Emdeon customers located in Michigan.  (Plea Agreement (Dkt. No. 37) ¶ 8.)  Over the course of three years, he fraudulently forged and fabricated contracts and contract addenda involving Emdeon customers and submitted the forged contracts to Emdeon.  (*Id.*)  Emdeon subsequently billed the customers inflated amounts based on the fraudulent contracts, and McCormick received increased commissions as a result of the inflated billing.  (*Id.*)  In furtherance of this scheme, his conduct

included vastly inflating the monthly fee customers agreed to pay Emdeon, forging the signature of Emdeon customer employees, creating fabricated email accounts and fictitious names of customer employees, and creating counterfeit checks. (*Id.*)

In total, McCormick fraudulently inflated the bills of Emdeon customers by more than $625,000, generating $107,587 in incentive compensation for himself. (*Id.*) After Emdeon learned of McCormick's scheme, it reversed or refunded any improper billing to its customers. (*Id.*) Thus, the only financial harm was suffered by Emdeon in the amount of the $107,587 it paid McCormick in commissions. (*Id.*) In addition to the fraudulently obtained incentive compensation, McCormick also continued to receive substantial salary from Emdeon, despite the fact that, apparently unbeknownst to Emdeon, he had also started a full-time job with another company. (*Id.*)

McCormick pled guilty on March 29, 2016 to two counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of mail fraud in violation of 18 U.S.C. § 1341 and agreed to the entry of a forfeiture judgment in the amount of $107,587. (*Id.*)

## B.     Original PSR

Following McCormick's March 29, 2016 guilty plea, the probation office completed the PSR on August 12, 2016 and supplemented it on September 13, 2016. The September 13, 2016 PSR calculated an advisory sentencing guideline range of 33 to 41 months. While McCormick did not object to the guideline range as calculated, he filed a sentencing memorandum arguing that upon consideration of the factors set forth in 18 U.S.C. § 3553(a), a downward departure from the guidelines range was warranted, such that he should only be sentenced to a maximum term of five years of probation along with no less than one year of house arrest. (*See* Dkt. Nos. 44, 45.)

In relevant part, McCormick argued that a departure was warranted and a non-custodial sentence was required based on "his caretaking role for his wife, son and mother." (Dkt. No. 45 at 18.) McCormick stressed the fact that he was the "primary caregiver for three others, his wife, son and mother," (*id.* at 5, 18), who relied on his "solid income of approximately $120,000/yr. plus commissions" as well as his health insurance—benefits he argued were particularly necessary for his wife, who was battling cancer, (*id.* at 12, 17). The PSR indicates McCormick reported to probation that he was employed by Technosoft Corporation as a vice president of business process management since July 2015. While he reported that his employer was aware of the criminal charges against him, McCormick did not have signing authority for the company's business contracts.

### C. September 20, 2016 Sentencing Hearing

We held a sentencing hearing on September 20, 2016. McCormick asked that the court "punish [him] in [his] home" in order to "continue to allow [him] to be a father to [his] son and a caretaker and ensurer [sic] to [his] wife." (Tr. Vol. I–A (Dkt. No. 55) at 13–14.) McCormick represented that "[o]n her own, my wife can't raise or take care of [my son]. Due to the side effects of her treatment, she's not even allowed to lift five pounds. So it's very difficult at times to – to live our daily life." (*Id.* at 14; *see also id.* at 15–16.) He further testified "I'm the only source of income for my family. They're all under my insurance, and the loss of either income or insurance will have an extremely devastating effect on my family and their lives. The loss of insurance alone would cause an extreme detriment to my wife's life, more importantly." (*Id.* at 17.)

With respect to his present employment, McCormick testified:

I've been successfully employed and have signed good, legal contracts. My doing so, I have removed myself from signature authority to my -- with my current employer, so now I can no longer sign contracts. I can only present them to the president/CEO for him to sign.

THE COURT: How does your present employer feel about your particular situation?

THE DEFENDANT: Not happy at all. He is of Indian descent. As you know, sometimes it's very difficult to work for people that are from out of the country. He is in this country however, built a successful business for 26 years. His feeling is if I am incarcerated, that he can no longer continue my employment.

Your Honor, I wake up every –

THE COURT: Why did he take a chance on you? Did you tell him right from the beginning what your situation was?

THE DEFENDANT: I told him when we pleaded, at the plea.

I wake up every day knowing the dread is still there.

THE COURT: And before you told him at the plea, did you have authority to sign contracts?

THE DEFENDANT: No.

THE COURT: Okay.

THE DEFENDANT: No. I've never had the authority. That's the way that company works and I prefer it that way. If I was ever to seek another job, that's the way I'd do it again. I don't want the thought or even the inclination of ever going through this process again.

(*Id.* at 18–19.)  After McCormick's allocution, argument from counsel, and testimony from the probation officer who conducted the presentence investigation, we took a short recess in order to allow the probation officer to further investigate the extent to which McCormick's family depended on him financially and to verify whether and when McCormick's current employer, Technosoft, learned about his indictment.  (*See id.* at 31–33.)  The probation officer also noted

that one thing that "rings true or [is] a red flag in this case is the interviews I had with [McCormick's] wife and his brother regarding his trustworthiness over the years. That typically does not happen in an interview in pre-sentence investigations where multiple family members continue to echo the same sentiment." (*Id.* at 32.) Mrs. McCormick had reported to the probation officer conducting the PSR interview that she was unaware of McCormick's guilty plea and instead thought he was just under investigation. When she learned he had already pled guilty, she reported being unsurprised, remarking that he "lies all the time. He's done it all his life and tells people what they want to hear." (*See* September 13, 2016 PSR (further indicating McCormick falsified documents to facilitate their marriage as he was not legally divorced from his first wife at the time of the marriage).) McCormick's brother also suggested to the probation officer that McCormick was estranged from his family due to trustworthiness issues. (*Id.*)

After the recess, the probation officer testified that, contrary to McCormick's representations, his wife had other family support nearby, including her mother, brother, and sister, who all lived 45 minutes away or less. (*Id.* at 33.) Mrs. McCormick also informed the probation officer that she was no longer in medical treatment, she could take care of daily tasks on her own, and she receives monthly disability payments in the amount of $2,000 for herself and $1,000 on behalf of her son, in addition to a monthly pension in the amount of $1,600. (*Id.* at 34.) The probation officer further testified that a human resources representative from McCormick's employer reported that McCormick was terminated from Technosoft as of July 29, 2016 for performance reasons, and he was no longer employed there. (*Id.* at 34–35.) McCormick, through counsel, responded that while he was no longer employed by Technosoft, he understood that he was still employed by Collasys, a subsidiary of Technosoft, stating that his "official employment[] was transferred from a larger entity to the subsidiary . . . as of July 29."

(*Id.* at 36 (adding "it's not his understanding that he was let go for performance reasons . . . —I think, meaningfully, he always was working for Collasys, whatever that may mean").)

Following another recess, the probation officer obtained and presented a signed statement from Technosoft's Director of Human Resources, which attested that McCormick was terminated from Technosoft as of July 29, 2016 for "unsatisfactory performance," because "after 13 months of employment, Mr. McCormick had no sales and no deals pending in the pipeline." (Dkt. No. 61–1 ¶¶ 2–3.) The affidavit stated that McCormick was personally informed of his termination by telephone. (*Id.*) The affidavit further indicated McCormick had never been employed by Collasys and never made anyone at Technosoft aware of any past, current, or pending legal matters. (*Id.*) In response, McCormick offered to provide screenshots purportedly showing he was paid every two weeks, insisting that Technosoft was "still paying him because he's still working." (Tr. Vol. I–B (Dkt. No. 50) at 2, 9.) He further argued through counsel that "he has no earthly idea why [the Technosoft human resources executive] is saying he doesn't work there, but that's simply untrue." (*Id.* at 2.)

The hearing was adjourned before a sentence was imposed, and the proceedings were continued in order to allow the probation office to investigate further and address the various inconsistencies revealed during the hearing, including whether McCormick "was let go [by his employer] and for what reason, whether or not he was reassigned to a related corporation and whether or not the reason for termination is correct." (*Id.* at 11.)

Following the hearing, the government presented earnings statements revealing that McCormick only received two paychecks after July 29, 2016. (Dkt. No. 59 at 3.) While McCormick's biweekly gross pay from January through July 2016 was approximately $5,200, on August 30, 2016, he received a check in the amount of $15,625, which was a severance payment.

(*Id.*)  The earnings statement describes the payment as "other" and shows no "Period Beginning Date," unlike his biweekly paychecks.  (*Id.* at n.4.)  McCormick received a second and final check on September 14, 2016 in the amount of $4,484.66, which represented payment for unused vacation time.  (*Id.* at n.5)  The earnings statement describes the payment as "Retro" or "Vacation" pay and likewise shows no "Period Beginning Date."  (*Id.*)  The government argued "Defendant misconstrued these severance and vacation payments as evidence that he continued to be employed by Technosoft in a bold attempt to obstruct the Court's inquiry."  (*Id.* at 3.)

Further, investigation following the September 20, 2016 sentencing hearing revealed that McCormick had concealed that in addition to Technosoft, he was also employed full time by a separate company, Computer Task Group ("CTG") from November 2, 2015 until his termination on December 11, 2015.  (Dkt. No. 61–3.)  McCormick did not disclose to probation that he was employed by CTG.  He also apparently concealed the employment from his attorney and from Technosoft, as he was simultaneously employed full time at both companies during November and December 2015.  (*Id.* at 4–5.)  As the government observed, McCormick previously fraudulently maintained multiple full-time jobs, including during the underlying offense, when he was employed by Emdeon and began working full-time for another health care company. (*See* Plea Agreement ¶ 8.)

### D.     Defendant's Motion to Strike

Following the sentencing hearing, on September 23, 2016, McCormick moved to strike unsupported factual statements or arguments previously submitted in:  (1) his sentencing memorandum; (2) his allocution during the September 20, 2016 sentencing hearing; and (3) defense counsel's argument during the sentencing hearing.  (Dkt. No. 51 at 1.) McCormick disavowed and moved to strike three categories of representations he made in connection with the September 20, 2016 sentencing hearing.  First, McCormick disavowed

"[a]ny and all suggestions that he is currently employed at Technosoft and/or Collasys"; instead, he admitted that he was terminated as of July 29, 2016 and remained unemployed at the time of the September 20, 2016 sentencing hearing.  (*Id.* at 2.)  Second, McCormick disavowed his representation that he disclosed all elements of his criminal prosecution to senior management at Technosoft or Collasys, including that he told management that he had pled guilty or was facing sentencing.  (*Id.*)  Third, McCormick sought to strike "all of his representations regarding his family's need for care and support."  (*Id.*)  McCormick also asked for leave to file a revised sentencing memorandum to "address the significance of the 'debacle' of September 20, 2016."  (*Id.* at 1.)  We denied McCormick's motion, finding that while we would not rely on any false or unsupported statements McCormick disavowed, nor would we strike any representations or arguments from the record.  (*See* Dkt. No. 56.)  We allowed his request to file a supplemental sentencing memorandum.  (*Id.*)

### E.     Supplemental PSR

The probation office completed a supplemental PSR on September 28, 2016.  Taking into account the sentencing hearing proceedings and subsequent investigation, the supplemental PSR added two points for obstruction of justice under U.S.S.G. § 3C1.1, raising the Total Offense Level to 23, and resulting in an advisory guideline range of 46 to 57 months incarceration. Neither McCormick nor the government objected to the advisory guideline range as calculated, but they disagreed in part as to how the range should be arrived at.  (*See* Dkt. Nos. 58, 59.) Specifically, they differed with respect to whether the obstruction enhancement under § 3C1.1 should apply and whether any credit should be given under § 3E1.1 for acceptance of responsibility.  (*Id.*)  In arriving at the Total Offense Level calculation, the probation office calculated a two-point credit for acceptance of responsibility for the offense of conviction

under § 3E1.1, finding this was an "extraordinary" case warranting the application of both an obstruction enhancement and a credit for accepting responsibility.

The government argued McCormick is not entitled to an acceptance of responsibility adjustment under § 3E1.1 as a result of McCormick's "obstructive and deceitful conduct" and "persistent lies and obstructive behavior." (*See* Dkt. Nos. 53, 59.) The government took no position as to whether the obstruction enhancement under § 3C1.1 should apply. (Dkt. No. 59 at 8, n.7.) As a result, the government also concluded the advisory sentencing guideline range should be 46 to 57 months and suggested an appropriate sentence should include a term of imprisonment of 46 months. (*Id.* at 7–8.) For his part, McCormick agreed with both probation and the government that the proper advisory guideline calculation was 46 to 57 months and "concede[d] that a 46 month sentence is fair and just under all the considerations of 18 U.S.C. § 3553(a)." (Dkt. Nos. 58, 62.)

### F. Second Supplemental PSR

In light of the apparent disagreement as to whether a credit for acceptance of responsibility under § 3E1.1 was warranted and whether an obstruction enhancement under § 3C1.1 should apply, we ordered the probation office to complete a second supplemental PSR for the purpose of calculating an advisory guideline range that assumed both an obstruction increase and no credit for acceptance of responsibility. (Dkt. No. 64.) We also invited the parties to respond and file objections to the second supplemental PSR. (*Id.*)

On November 1, 2016, probation submitted a second supplemental PSR, which calculated a 57 to 71 month advisory guideline sentence, assuming an enhancement for obstruction and no credit for acceptance of responsibility were applied. In response, the government indicated it previously "felt constrained by the terms of the plea agreement not to recommend an enhancement for obstruction of justice." (Dkt. No. 67 at 2.) Specifically, the

government was "concerned that by affirmatively agreeing with the supplemental PSR that an obstruction enhancement should apply, it could be considered to be in breach of paragraph 10(a)(v) of the plea agreement, which states that '[t]he parties agree to recommend that no additional upward or downward adjustments, or U.S.S.G.-based departures, are appropriate.'"  (*Id.* at 2.)  After "discuss[ing] with defense counsel the issue of breach, and . . . further research[ing]," the government "is now in agreement with McCormick that it would be appropriate under the circumstances for the Court to impose an enhancement for obstruction while still granting a reduction for acceptance of responsibility," resulting in a 46 to 57 months guidelines range.  (*Id.*)  The government nevertheless stated that should we "find that this is *not* an extraordinary case—and that McCormick's obstruction indicates that he has not fully accepted responsibility—such a decision would not be clearly erroneous under the facts." (*Id.* at 3, n.3 ("[I]t is the government's position that, while a close call, on balance both the enhancement for obstruction and the reduction for acceptance should be applied here.").)

In turn, McCormick agrees that he will not assert that the government breached the plea agreement by recommending an enhancement for obstruction of justice.  (*Id.* at 2, n.2.) McCormick argues the key issue before the court is "how much Mr. McCormick's advisory guideline should be increased, based on his conduct on September 20, 2016."  (Dkt. No. 66 at 3 (arguing the guideline should be increased from 33-to-41 months to 46-to-57 months, rather than to 57-to-71 months).)  He contends that while an obstruction increase is warranted based on "the utter absurdity of Mr. McCormick's misrepresentations at sentencing," this case is an extraordinary one allowing for adjustments under both §§ 3C1.1 and 3E1.1.  (*Id.* at 9–10.)  In particular, he argues that his post-obstruction behavior "indicates that he has taken responsibility for his misconduct by (1) promptly attempting to rectify it, and (2) acknowledging that he

deserves every day of punishment recommended by the government and probation." (*Id.* at 10.)

McCormick argues that sentencing him to 46 months in prison "is sufficient, but no greater than

necessary, to sanction [him] for his foolish and self-defeating dishonesty." (*Id.* at 11.)

**ANALYSIS**

*O, what a tangled web we weave,*
*When first we practise to deceive!*

— Sir Walter Scott, *Marmion*

We turn now to address the correct advisory guideline range, and the related matter of

whether a departure, if any, is reasonable.  Prior to the September 20, 2016 sentencing hearing,

the primary question with respect to sentencing centered on whether a downward variance was

warranted from the 33 to 41 month advisory guideline range calculated in the original PSR.  In

the current posture, the issue is now whether the guidelines range should be increased to 46 to 57

months or to 57 to 71 months based on McCormick's conduct leading up to and during the

September 20, 2016 sentencing hearing, and what sentence is ultimately reasonable after

considering all the circumstances.

## I.     OBSTRUCTION OF JUSTICE

Section 3C1.1 of the United States Sentencing Guidelines provides that the offense level

may be increased by two levels where a defendant "willfully obstructed or impeded, or attempted

to obstruct or impede, the administration of justice during the course of the investigation,

prosecution, or sentencing of the instant offense of conviction," and where the obstructive

conduct related to "(i) the defendant's offense of conviction and any relevant conduct; or (ii) a

closely related offense."  U.S.S.G. § 3C1.1, cmt. n.1.  Included among non-exhaustive examples

of obstructive conduct are committing perjury, providing materially false information to a judge,

providing materially false information to a probation officer in respect to a presentence

investigation, and conduct prohibited by obstruction of justice provisions under

18 U.S.C. §§ 1510 and 1151. *Id.* at cmt. n.4.

The facts support application of the two-level obstruction increase under § 3C1.1 here, and McCormick, the government, and probation are now all in agreement that an obstruction enhancement is warranted. (*See* Dkt. Nos. 66, 67.) From his fraudulent conduct at Emdeon through and including his statements at the September 20, 2016 sentencing hearing, McCormick wove a web of lies conveyed to his wife, his employer, his lawyer, the probation office, the prosecutor, and the court. In particular, McCormick made numerous false statements, which he later disavowed, to his attorney, the court, and probation regarding his employment status and his family's reliance on his financial support, all in an effort to bolster his argument for sentencing leniency.[1] McCormick insisted that he was employed by Technosoft or Collasys and was the "only source of income for [his] family" despite knowing he had in fact been fired prior to the completion of the presentence investigation and more than six weeks before his sentencing hearing. He maintained his claim that he was employed even after his attorney stated on the record that McCormick understood he would suffer greater punishment if his representations were disproved. Further, as revealed during the September 20, 2016 sentencing hearing, McCormick's family did not solely rely on his income. Rather, his wife received significant pension and disability payments (on behalf of herself and their son) totaling more than $4,000 per month. McCormick told additional lies during the sentencing hearing, telling the court his employer had been aware of his criminal charges since he pled guilty and was "[n]ot happy at

---

[1] We emphasize that in discussing McCormick's misconduct, we do not implicate defense counsel in any manner. Insofar as we have observed, defense counsel provided competent and professional representation, and far from enabling McCormick's actions in connection with sentencing, counsel appears also to have been deceived by McCormick's obstruction.

all." Finally, McCormick failed to disclose the fact that he had also been employed by CTG while concurrently holding full-time employment at Technosoft.

McCormick's misrepresentations were material, as they influenced whether his conduct and his history and characteristics warranted a sentence within the guideline range. *See United States v. May*, 568 F.3d 597, 607 (6th Cir. 2009); *United States v. Sassanelli,* 118 F.3d 495, 501 (6th Cir. 1997); U.S.S.G. § 3C1.1, cmt. n.5 (stating the term "material" refers to "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination"). McCormick has made no argument that his misrepresentations resulted from confusion, faulty memory, or misunderstanding. *C.f.* U.S.S.G. § 3C1.1, cmt. n.2. To the contrary, they were willful and, while misguided, apparently calculated to gain leniency and to support his argument for a non-custodial sentence.

Moreover, as the government argued in its supplemental sentencing memorandum, McCormick's false statements to the probation office and the court potentially violated several federal criminal laws and the conditions of his pretrial release. (*See* Dkt. No. 59 at 6.) For instance, had McCormick's lies to the court at the September 20, 2016 sentencing hearing been made under oath, they could constitute perjury in violation of 18 U.S.C. § 1621, and may constitute criminal contempt of court under 18 U.S.C. §§ 401(a) and 1503. Furthermore, McCormick's misrepresentations to both the court and probation may constitute a violation of 18 U.S.C. § 1001, which criminalizes knowingly making "any materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of the judicial branch. The integrity of the court and the viability of the criminal justice system critically depend on the honesty of all parties involved and the receipt of truthful information—whether given under oath before the court, to a probation officer in connection with a presentence report,

or to an investigator pretrial. *See, e.g.*, *United States v. Dunnigan*, 507 U.S. 87, 97, 113 S. Ct. 1111, 1118 (1993) (explaining that our system of justice "insists on the value of testimony under oath" in order to "uphold the integrity of our trial system"). And while "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so," that privilege "cannot be construed to include the right to commit perjury" or otherwise obstruct justice. *Harris v. New York*, 401 U.S. 222, 225, 91 S. Ct. 643, 645 (1971); *see also Oregon v. Hass*, 420 U.S. 714, 722, 95 S. Ct. 1215, 1221 (1975) ("We are, after all, always engaged in a search for truth in a criminal case so long as the search is surrounded with the safeguards provided by our Constitution."); *Dunnigan*, 507 U.S. at 97–98, 113 S. Ct. at 1118 ("It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process. The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury.").

In sum, under § 3C1.1, McCormick's obstructive conduct in concealing his employment status and in misrepresenting to the court and to the probation office material information about his income, employment, and his family's reliance on his financial support  constitutes obstruction of justice. Accordingly, the two point enhancement under § 3C1.1 is appropriate.

## II.      ACCEPTANCE OF RESPONSIBILITY

Pursuant to § 3E1.1, where the defendant "clearly demonstrates acceptance of responsibility for his offense," he qualifies for a two-level decrease in offense level.

U.S.S.G. § 3E1.1(a).[2]  The defendant bears the burden of showing that he has accepted

responsibility.  *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006);

*United States v. Banks*, 252 F.3d 801, 806 (6th Cir. 2001).  Ordinarily, conduct resulting in an

enhancement for obstruction of justice under § 3C1.1 indicates that the defendant has not

accepted responsibility for the criminal conduct.  U.S.S.G. § 3E1.1, cmt. n.4;

*United States v. Robinson*, 390 F.3d 853, 888 (6th Cir. 2004); *United States v. Angel*,

355 F.3d 462, 477 (6th Cir. 2004).  "There may, however, be extraordinary cases in which

adjustments under both §§ 3C1.1 and 3E1.1 may apply."  U.S.S.G. § 3E1.1, cmt. n.4.  "The

defendant has the burden of proving the extraordinary nature of his or her case."

*Angel*, 355 F.3d at 477 (citing *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003)).  We

may consider all post-indictment activity in determining whether to apply an acceptance of

responsibility decrease.  *United States v. Harper*, 246 F.3d 520, 526–27 (6th Cir. 2001),

*overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002).

     In determining whether a case is "extraordinary," courts apply an "exacting standard" and

examine the relationship between the obstructive conduct and the acceptance of responsibility.

*Gregory*, 315 F.3d at 640.  "Appropriate considerations for determining whether a reduction is

warranted for acceptance of responsibility include the defendant's truthful admission of the

charged offense, the defendant's voluntary assistance to authorities in resolving the offense, and

the timeliness of the defendant's conduct in affirmatively accepting responsibility for his

actions."  *United States v. Jeross*, 521 F.3d 562, 582 (6th Cir. 2008)

---

[2] In addition, where the original offense level is calculated at level 16 or greater, a defendant who
qualifies for the acceptance of responsibility decrease, and who "assisted authorities in the
investigation or prosecution of his own misconduct by timely notifying authorities of his
intention to enter a plea of guilty," may qualify for an additional one-level decrease.
U.S.S.G. § 3E1.1(b).  The Government has not moved for an additional one level decrease, and
we cannot apply a § 3E1.1(b) decrease absent a government motion.

(citing *Gregory*, 315 F.3d at 640). A defendant who enters a guilty plea is not entitled to an adjustment under § 3E1.1 as a matter of right. U.S.S.G. § 3E1.1, cmt. n.3. But "as long as the defendant's acceptance of responsibility is not contradicted by an ongoing attempt to obstruct justice, the case is an extraordinary case within the meaning of Application Note 4 and simultaneous adjustments under §§ 3C1.1 and 3E1.1 are permissible."

*Gregory*, 315 F.3d at 640–41; *see also United States v. Kobasic*, 639 F. App'x 308, 313 (6th Cir. 2016) ("Sixth Circuit precedent favors applying the acceptance of responsibility reduction in cases where the obstruction occurs before a defendant is aware of the government's interest in his or her affairs."); *United States v. Sanders*, 501 F. App'x 455, 458 (6th Cir. 2012) (observing the Sixth Circuit "has repeatedly held that engaging in obstructive conduct following the entry of a guilty plea is inconsistent with acceptance of responsibility");

*Jeross*, 521 F.3d at 582 (emphasizing the timing of the obstructive conduct and finding the fact that the defendant engaged in obstructive conduct after his guilty plea counseled against applying credit for acceptance of responsibility).

McCormick argues that his case is "extraordinary" because he quickly attempted to correct his misrepresentations and his obstructive conduct, and he "has acknowledged his moral fault by permitting counsel to concede that the sentence recommended by both the prosecution and probation, of 46 months to serve, is appropriate." (Dkt. No. 66 at 9–10.) Thus, he contends "he has taken responsibility for his misconduct by (1) promptly attempting to rectify it, and (2) by acknowledging that he deserves every day of punishment recommended by the government and probation." (*Id.* at 10.) The government also argues that the fact that McCormick's misrepresentations "did not purport to cast doubt on his guilt suggests that his obstruction should not preclude a finding of acceptance." (Dkt. No. 67 at 3.) The government

further finds "significant . . . the fact that McCormick has now acknowledged his misrepresentations and sought to disavow them." (*Id.* at 3.)

We agree that McCormick admitted the offense conduct, cooperated with the authorities, and pled guilty before trial, all of which may support a reduction for accepting responsibility. However, McCormick's cooperation and acceptance of responsibility for the underlying offense are contradicted by his related, ongoing deceptive conduct aimed at his employers, his lawyer, the prosecution, the court, and probation during the presentence investigation and sentencing phase. *Gregory*, 315 F.3d at 640–41. The deceptive and fraudulent conduct McCormick engaged in after his guilty plea is consistent with the fraudulent nature of the underlying crimes in this case. The government observed that McCormick's sentencing conduct "is part of a pattern of McCormick making blatant, verifiably-false misrepresentations to (successfully) obtain a short-term gain." (Dkt. No. 59 at 7.) Thus, while his obstructive conduct in connection with the sentencing proceedings did not directly cast doubt on his guilt, he nevertheless misrepresented facts in order to dishonestly support his request for a downward departure under 18 U.S.C. § 3553(a). *See United States v. Roche*, 321 F.3d 607, 608 (6th Cir. 2003) (refusing to apply § 3E1.1 where the defendant submitted several fabricated documents "calculated to generate a downward departure in his sentence" and where he continued to engage in obstruction throughout the proceedings).

Nor are we convinced that McCormick's prompt disavowal of his misrepresentations absolves his obstruction and supports an acceptance of responsibility credit, because McCormick only admitted to his deceit after he was already caught in a lie. For example, until proven otherwise, he insisted he was still employed on September 20, 2016, going to such lengths as insisting to the court that he was still getting paid, knowing all the while that the payments he

received were not his ordinary biweekly wages.  *See, e.g.*, *Romanini*, 502 F. App'x 503, 512 (6th Cir. 2012) (finding the defendant did not timely accept responsibility for his actions where, among other things, he "told the truth only after he was caught in a lie").  Such behavior demonstrates recalcitrance to accepting responsibility, and a willingness to continue to engage in deceitful conduct in order to gain a more favorable outcome.

Thus, while cognizant of the fact that "acceptance of responsibility, as contemplated by the United States Sentencing Commission, is acceptance of responsibility *for his offense*," *United States v. Morrison*, 983 F.2d 730, 735 (6th Cir. 1993), we find that here, the conduct McCormick displayed in connection with his sentencing constitutes a continuation of the fraudulent and deceptive conduct involved in the underlying offense, and therefore, McCormick is not entitled to a credit for acceptance of responsibility under U.S.S.G. § 3E1.1.  *See Romanini*, 502 F. App'x at 511 ("Moreover, we have recognized that a defendant's case is not extraordinary when he continues to obstruct justice after purporting to cooperate with government officials."); *United States v. Adams*, 321 F. App'x 449, 459–60 (6th Cir. 2009) (finding a reduction under § 3E1.1 was not warranted where, although the defendant pled guilty, participated in interviews with investigators, and provided significant truthful information, he also lied to investigators and continued to "obstruct justice and evade responsibility for ongoing criminal activity" even at the time of sentencing); *Jeross,* 521 F.3d at 582 (affirming the district court's refusal to apply reduction for acceptance of responsibility where, after pleading guilty, defendant threatened a coconspirator); *United States v. Wilson*, 197 F.3d 782, 786–87 (6th Cir. 1999) (finding no error where no acceptance of responsibility credit was given after the defendant lied to the court and the probation office about his birth name and criminal history during the presentence investigation); *United States v. Reed*, 951 F.2d 97, 99–100 (6th Cir. 1991) (denying an

acceptance of responsibility reduction after the defendant engaged in fraud from a jail telephone while pending sentencing for credit card fraud); *United States v. Snyder*, 913 F.2d 300, 305 (6th Cir. 1990) (upholding a determination that no acceptance of responsibility reduction was warranted where the defendant, while pleading guilty in connection with possessing and distributing cocaine, conspired to acquire additional cocaine).

For the foregoing reasons, we find McCormick's misrepresentations in connection with his sentencing to be inconsistent with his acceptance of responsibility. We therefore decline to apply a decrease for acceptance of responsibility under § 3E1.1.

## III.    DEPARTURE

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however." *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007). After correctly calculating the applicable guidelines range, we must also consider the factors set forth in 18 U.S.C. § 3553(a). *Id.*; *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005) (citing *United States v. Booker*, 543 U.S. 220, 259–60, 125 S. Ct. 738, 764–65 (2005)). Section 3553(a) provides:

> The court, in determining the particular sentence to be imposed, shall consider—(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [under the sentencing guidelines] . . .; (5) any pertinent policy statement . . .; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  We may vary from the guidelines range "in order to comply with the mandate that the sentence be 'sufficient, but not greater than necessary' to satisfy the purposes of sentencing set forth in § 3553(a)(2)."  *United States v. Keller,* 498 F.3d 316, 323 (6th Cir. 2007) (quoting *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006)).

Here, we give great weight to the fact that the government and the defendant agree that a sentence including 46 months incarceration is fair and just, and is sufficient, but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a). (*See* Dkt. No. 66 at 11; Dkt. No. 67 at 4.)  In addition, we find the nature and circumstances of the offense support this conclusion.  The actual loss to Emdeon, McCormick's employer at the time of the offense, was $107,000, but the guidelines range is based on the intended loss, which is significantly greater at $625,000.  (*Id.*)  As McCormick observes, this difference results in four additional offense levels under U.S.S.G. § 2B1.1, but was based on an absurd plot that was highly unlikely to succeed.  (*Id.*)  Considering all of the circumstances, we find the advisory guidelines range overestimates the seriousness of the offense to some degree.

We also give weight to the history and characteristics of McCormick, as well as the need for the sentence to impose adequate deterrence and protect the public from future crimes or misconduct.  This is McCormick's first criminal offense of any kind.  It is also apparent that mental and emotional issues influenced McCormick's conduct at the time of the crime. *See* U.S.S.G § 5H1.3 ("Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.").  We find instructive the report of Dr. James Walker, a board certified forensic psychologist and neuropsychologist who interviewed McCormick and

observed, among other things, that McCormick's "behavior is not malignant, it is pitiful." (Dkt. No. 46–1 at 11.)  The context in which the offense took place indicate McCormick was unusually influenced by a number of factors, including untreated mental health issues (depression, anxiety, and a "maladaptive" desire to please), financial and marital stress (including his wife's cancer diagnoses), and other issues.   While these circumstances do not excuse McCormick's conduct, they do help to explain it.  Further, these are issues which may be treated by psychotherapy, something McCormick has demonstrated he is amenable to. (*See, e.g.*, Dkt. No. 70–1 (indicating McCormick has sought therapeutic help and has been attending weekly psychotherapy sessions since October 18, 2016).)  Departing from the sentencing guidelines range of 57 to 71 months to 46 months imprisonment will allow McCormick to continue to seek mental health counseling at an appropriately early release from custody, as well as an earlier return to the workforce, allowing him to complete his restitution.

After considering all of the factors set forth in § 3553(a), and in particular the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, we agree with the parties that a sentence of 46 months imprisonment is sufficient, but not greater than necessary to satisfy the purposes of sentencing.

## CONCLUSION

For the foregoing reasons, we determine a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1 is appropriate here.  We further decline to apply credit for acceptance of responsibility under U.S.S.G. § 3E1.1.  Accordingly, we adopt the second supplemental PSR, and based on a Total Offense Level of 25 and Criminal History Category I, the advisory guideline range is 57 to 71 months.  After considering all of the

factors set forth in 28 U.S.C § 3553(a), we determine a downward variance is reasonable under the circumstances, and we sentence McCormick to 46 months imprisonment.[3] McCormick shall surrender for service of his sentence at the institution designated by the Bureau of Prisons before 2:00 p.m. on March 13, 2017.

As ordered during the January 10, 2017 sentencing hearing, a $300 special assessment is imposed. Upon release from prison, McCormick shall serve three years of supervised release as to each of Counts 2, 3, and 9, with all counts to run concurrent with each other. The following mandatory conditions will apply, as set forth in the Judgment to be entered in this case: (1) McCormick must not commit another federal, state, or local crime; (2) he shall not unlawfully possess a controlled substance; (3) he must refrain from any unlawful use of a controlled substance and must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court; and (4) he must cooperate in the collection of DNA as directed by the probation officer. In addition to the mandatory conditions, and as set forth more fully in the Judgment to be entered in this case, the following special conditions of supervision shall apply: (1) McCormick shall immediately pay restitution to Change Healthcare Operations, LLC (formerly Emdeon) in an amount totaling $107,586; (2) he shall furnish all financial records, including, without limitation, earnings records and tax returns, to the United States Probation Office upon request; (3) he shall not incur new debt or open

---

[3] At first glance, a less complex and more expedient methodology for calculating the defendant's sentence of 46 months would be to accept the sentencing guideline calculations proposed by the probation office and the parties calling for a sentencing range of 46 to 57 months with a recommendation for a 46 month sentence. To reach this proposed sentencing guideline range, of course, would require that the Court give the defendant credit for acceptance of responsibility for the instant criminal conduct. Specifically, as discussed herein, this would necessitate that the Court ignore the defendant's post-plea fraudulent behavior during the sentencing proceedings. The Court cannot do so. The totality and consequences of Defendant's fraudulent conduct must be fully and fairly documented in the record of his sentence.

additional lines of credit without prior approval of the United States Probation Office;

(4) he shall participate in a program of drug testing and substance abuse treatment; (5) he

shall participate in a mental health program as directed by the United States Probation

Office; (6) he is prohibited from owning, carrying, or possessing firearms, ammunition,

destructive devices, or other dangerous weapons; and (7) he shall cooperate in the

collection of DNA as directed by the United States Probation Office.  It is so ordered.

_____

Marvin E. Aspen
United States District Judge

Dated:  February 7, 2017
          Chicago, Illinois